W. Scott Ferron, WSBA #61154
Kevin J. Kennedy, WSBA #55687
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101
(206) 245-1700
Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| NADINE WOODWARD,<br><br>Plaintiff,<br>v.<br><br>CITY OF SPOKANE; BETSY WILKERSON; LORI KINNEAR; KAREN STRATTON; and ZACK ZAPPONE, each in his or her personal and official capacity,<br><br>Defendants. | No. 2:26-cv-00310<br><br>DECLARATION OF W. SCOTT FERRONG IN SUPPORT OF RESPONSE TO PLAINTIFF'S MOTION TO DENY/STRIKE DEFENDANTS' MOTION TO DISMISS FOR NONCOMPLIANCE RESUBMISSION |

I, W. Scott Ferron , declare and state as follows:

1. I am over the age of 18, make this declaration based on my personal knowledge and am competent to testify to the matters stated herein if called upon to do so.

2. I am an attorney at Pacifica Law Group LLP and am counsel in this matter representing Defendants.

3. On October 20, 2026, Defendants filed their Motion to Dismiss, refiled within page limits. ECF No. 15. The argument portion of the motion is 20 pages.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4. The body text of ECF No. 15 is set in 14-point Times New Roman, with paragraph line spacing set to "exactly 28 points" in Microsoft Word. Each line of text therefore occupies 28 points, twice the 14-point type size.

5. This is the format I and my colleagues at Pacifica Law Group regularly use for filings in the Eastern District of Washington. *See e.g.*, Motion to Dismiss, *Shea v. City of Spokane*, No. 2-25-cv-00031JAG**,** ECF No. 6 (filed Jan. 30, 2025); Motion to Dismiss, *Beuca v. Washington State University*, No. 2-23-CV-00069-TOR, ECF No. 2 (filed Mar. 22, 2023). We did not adopt or change this format for ECF No. 15 in response to this Court's order. It is the same format that we used for both our original motion to dismiss, ECF No. 12, and our stipulated motion to exceed page limits, ECF No. 11. We understand this format to comply with this Court's Local Civil Rules.

6. Attached as **Exhibit A** is a true and correct copy of a page titled "Line Spacing" from the online edition of *Typography for Lawyers* (2d ed.) by Matthew Butterick. Available at https://typographyforlawyers.com/line-spacing.html, printed on November 25, 2026.

7. Attached as **Exhibits B through D** are true and correct copies of the following filings, which I obtained from dockets available on Westlaw:

8. **Exhibit B:** State Defendants' Opposition to Plaintiffs' Motion for Injunctive and Declaratory Relief, *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD, ECF No. 23 (Oct. 24, 2022), filed by the Washington Attorney General's Office Complex Litigation Division.

9. **Exhibit C:** Reply in support of Motion for Judgment as a Matter of



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Law, New Trial, and/or Remittitur, No. 2:20-cv-00410-MKD, ECF No. 302 (Sept. 26, 2022), filed by Perkins Coie LLP.

10. **Exhibit D:** Motion in Limine, *Mukherjee v. Washington State University*, No. 2:19-cv-00402-SAB, ECF No. 119 (June 24, 2024), filed by a separate division of the Washington Attorney General's Office.

11. Based on my review, the body text of each of Exhibits B through D is set in 14-point type with lines spaced 28 points apart, the same format as ECF No. 15.

12. By comparison, applying Microsoft Word's "Double" line-spacing setting to 14-point Times New Roman produces lines approximately 32 points apart, about 2.3 times the type size. *See* **Exhibit A**. When I reformatted a copy of ECF No. 15 using Word's "Double" setting, with no other changes, the portion of the motion that did not include the table of contents or the table of authorities ran 23 pages. I do not know how or why Plaintiff's counsel Westlaw AI told her that it would 25 pages. *See* ECF No. 20.

13. On the morning of November 12, 2026, Plaintiff's counsel contacted me about the line spacing of ECF No. 15 and asked Defendants to withdraw and refile the motion. That morning and afternoon there was a large Microsoft Outlook outage and our law firm email system was incapable of receiving or sending messages. Plaintiff's counsel filed the motion to strike at 1:55pm that day, before our email system became functional again.

I declare under penalty of perjury under the laws of the United States of



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

America that the foregoing is true and correct to the best of my knowledge.

DATED this 25th day of November, 2026 in Seattle, Washington.

*s/ W. Scott Ferron*
W. SCOTT FERRON



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# EXHIBIT A

## line spacing

*120–145% of the point size*

*Line spacing* is the vertical distance between lines of text. Most writers use either double-spaced lines or single-spaced lines—nothing in between—because those are the options presented by word processors.

These habits are obsolete TYPEWRITER HABITS. Originally, a typewriter's platen could only move the paper vertically in units of a single line. Therefore, line-spacing choices were limited to one, two, or more lines at a time. Single-spaced typewritten text is dense and hard to read. But double-spacing is still looser than optimal.

The traditional term for line spacing is **leading** (rhymes with **bedding**), so named because traditional print shops put strips of lead between lines of type to increase vertical space.

Most courts adopted their line-spacing standards in the typewriter era. That's why court rules usually call for double-spaced lines. On a typewriter, each line is the height of the font, thus double spacing means twice the font size. So if you're required to use a 12-point font, double line spacing means 24 points.

Curiously, the so-called "double" line-spacing option in your word processor doesn't produce true double line spacing. Microsoft Word's "double" spacing, for instance, is about 15% looser, and it varies depending on the font. To get accurate spacing, you should always set it yourself, exactly.

> For most text, the optimal line spacing is between 120% and 145% of the point size. Most word processors, as well as CSS, let you define line spacing as a multiple. Or you can do the math—multiply your point size by the percentage. (The text in this paragraph has line spacing of 110%. It's too tight.)

> For most text, the optimal line spacing is between 120% and 145% of the point size. Most word processors, as well as CSS, let you define line spacing as a multiple. Or you can do the math—multiply your point size by the percentage. (The text in this paragraph has line spacing of 135%. It looks fine.)

> For most text, the optimal line spacing is between 120% and 145% of the point size. Most word processors, as well as CSS, let you define line spacing as a multiple. Or you can do the

math—multiply your point size by the percentage. (The text in this paragraph has line spacing of 170%. It's too loose.)

Word processors have a bewildering number of ways to set line spacing. Don't be thrown off—it all comes back to the same thing.

If you prefer setting line height in inches rather than points, divide the point measurement by 72 (there are 72 points to an inch).

---

### HOW TO SET LINE SPACING

WORD

*Right-click in the text and select* ‹ Paragraph › *from the menu. Go to the menu under* ‹ Line spacing ›. ‹ Exactly › *is best—enter a fixed measurement.* ‹ Single ›, ‹ 1.5 lines ›, *and* ‹ Double › *are equivalent to about 117%, 175%, and 233% line spacing, contrary to what their names suggest. Don't use these—they miss the target zone of 120–145%.* ‹ Multiple › *is also acceptable—enter line spacing as a decimal. To get line spacing in the 120–145% range, use a* ‹ Multiple › *value of 1.03–1.24. (Not 1.20–1.45—as noted above, Word uses peculiar line-spacing math.) Never use* ‹ At least ›, *because that gives Word permission to adjust your line spacing unpredictably.*

WORDPERFECT

‹ Format › → ‹ Line › → ‹ Height › *and* ‹ Spacing ›. *Line spacing in WordPerfect is the* ‹ Height › *value multiplied by the* ‹ Spacing › *value. (The benefit of this complication may be appreciated by WordPerfect fans. It is lost on me.) I recommend always leaving* ‹ Spacing › *at 1.0 and just setting your line spacing with* ‹ Height ›. *Selecting* ‹ Height › *lets you choose from* ‹ Fixed › *or* ‹ At Least ›. *Use* ‹ Fixed › *—enter a measurement in the 120–145% range. Don't use* ‹ At Least ›.

---

### BY THE WAY

→ Recall that different fonts set at the same point size may not appear the same size on the page. (See POINT SIZE for why.) A side effect is that fonts that run small will need less line spacing, and vice versa.

→ Line spacing affects the length of a document more than point size. If you need to fit a document onto a certain number of pages, try adjusting the line spacing first.

I would make the same argument against court rules that demand specific fonts, like TIMES NEW ROMAN or Arial, because they're also commercially licensed software.

→ Some lawyers have suggested to me that courts should adopt Microsoft Word's interpretation of line spacing as the standard. I disagree, for a simple but serious reason. Access to the courts is a fundamental right. Interpreting line spacing according to the quiddities of a commercial software program would imply that parties have to buy a license to that program to comply with the rules and thereby gain access to the courts. But double line spacing in its traditional sense can be implemented with any typesetting program.

# EXHIBIT B

Case 1:22-cv-03093-MKD ECF No. 23 filed 11/25/22 PageID.3671 Page 1 of 28

R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
ANDREW HUGHES, WSBA #49515
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Washington State Office of the Attorney General
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**
**AT YAKIMA**

| | |
|---|---|
| MICHAEL SCOTT BRUMBACK, an individual, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT W. FERGUSON, in his official capacity as Washington State Attorney General, et al.,<br><br>Defendants,<br><br>ALLIANCE FOR GUN RESPONSIBILITY,<br><br>Defendant-Intervenor. | NO. 1:22-cv-03093-MKD<br><br>STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF<br><br>NOVEMBER 23, 2022<br>With Oral Argument: 11:00 a.m. |

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 1

III. ARGUMENT ........ 3

A. Preliminary Injunction Standard ........ 3

B. Plaintiffs Are Unlikely to Succeed on the Merits ........ 4

1. LCMs do not fall within the Second Amendment's text ........ 5

a. LCMs are not "arms," and limiting their manufacture and sale does not infringe on any protected conduct ........ 5

b. The Second Amendment does not protect military-style weapons, such as firearms equipped with LCMs ........ 7

2. SB 5078 is part of a robust historical tradition of regulating weapons commonly used in lawless interpersonal violence 14

a. States have long regulated weapons that contribute to lawless violence ........ 15

b. SB 5078 resembles historical and traditional analogues 16

3. Plaintiffs' state constitutional claim lacks merit ........ 19

C. Plaintiffs Face No Irreparable Harm ........ 21

D. The Equities and Public Interest Weigh Heavily Against an Injunction ........ 23

IV. CONCLUSION ........ 24




ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# I. INTRODUCTION

Responding to a nationwide epidemic of gun violence, the Washington Legislature enacted SB 5078 to limit the manufacture and sale of one particular firearm accessory with a disproportionate role in mass shootings: large capacity magazines (LCMs). Plaintiffs Michael Brumback and Gimme Guns, LLC seek to overturn this common-sense law, and belatedly seek the extraordinary remedy of a preliminary injunction, but their challenges lack merit. LCMs are not covered by the Second Amendment because they are not "arms," nor are they necessary for self-defense purposes; rather, they are non-essential accessories that enhance the killing power of offensive or military-style weapons. And preliminary research indicates that the regulation of LCMs fits comfortably within the long history and tradition of regulating dangerous and unusual weapons to promote public safety. Further, having slept on their asserted rights for months after SB 5078 went into effect, Plaintiffs are not entitled to an injunction because they fail to demonstrate irreparable harm: Mr. Brumback's collection of LCMs is untouched by Washington's law, which does not prohibit possessing these items, and as a seller Gimme Guns stands to suffer reparable monetary injury at best. Finally, Plaintiffs' wildly overbroad request to enjoin the law in its entirety is inequitable and contrary to the public interest. Their Motion should be denied.

# II. BACKGROUND

The Legislature passed Senate Bill 5078 (SB 5078) to address the epidemic of gun violence and mass shootings that "threat[ens] . . . the public health and



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

safety of Washingtonians." Engrossed Substitute S.B. 5078, § 1, 67th Leg., Reg. Sess. (Wash. 2022). The Legislature found that LCMs—ammunition feeding devices capable of holding more than ten rounds—in particular contributed to "increase[d] casualties by allowing a shooter to keep firing for longer periods of time without reloading." *Id.* Citing the use of LCMs in "all 10 of the deadliest mass shootings since 2009," the Legislature noted that from 2009 to 2018 the use of LCMs in mass shooting events "caused twice as many deaths and 14 times as many injuries," whereas mass-shooting casualties declined while a federal ban was in effect. *Id.* Accordingly, the Legislature found that "restricting the sale, manufacture, and distribution of [LCMs] is likely to reduce gun deaths and injuries," without interfering with "responsible, lawful self-defense." *Id.*

To achieve this goal, SB 5078 prohibits LCMs' manufacture, distribution, import, and sale, with exemptions for military and law enforcement. The law does this while "allowing existing legal owners to retain the large capacity magazines they currently own." *Id.* No firearm is rendered inoperable due to SB 5078, because all guns capable of accepting LCMs—even AR-15s and the like—can fully function with magazines that hold 10 rounds or fewer. Busse Decl. ¶¶ 4–6.

In regulating LCMs, the Legislature was responding to the relatively recent, and increasingly salient, phenomenon of shooting deaths tied to the proliferation of these firearm accessories. SB 5078, § 1; *see also* Busse Decl. ¶ 3. While Plaintiffs point to a small number of historical weapons they contend are analogous to modern LCMs, in truth these lethal accessories did not become



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

popular with civilians until after 2004, when the Federal Assault Weapons Ban—which also banned LCMs—lapsed. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110103, 108 Stat. 1796; Busse Decl. ¶ 3; *see also infra* at 18 n.6. Assault rifles and LCMs failed to gain popularity with the civilian public until around 2007, when the gun industry began aggressively marketing them as "tactical" weapons. *Id.* As assault weapons and LCMs spread through the commercial market, their use in high-profile shootings became increasingly common, as the Legislature found. SB 5078, § 1.

In response, Washington joined a growing list of states that have limited the manufacture and sale of these deadly firearm accessories. *See* Giffords Law Center, *Large Capacity Magazines*, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/ (last visited Oct. 20, 2022) (summarizing LCM laws from 12 states and D.C.). SB 5078 went into effect on July 1, 2022. SB 5078, § 6. Plaintiffs filed the instant Motion three months later, on October 3, 2022.

## III. ARGUMENT

### A. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Its purpose is "to preserve the status quo ante litem," and "it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

(9th Cir. 1963). Plaintiffs seeking a preliminary injunction must establish that: (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. To succeed, Plaintiffs must satisfy all four *Winter* factors, even under the Ninth Circuit's alternative sliding scale test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132, 1135 (9th Cir. 2011).

**B. Plaintiffs Are Unlikely to Succeed on the Merits**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court announced a new test for evaluating state firearm regulations under the Second Amendment. __ U.S. __, 142 S. Ct. 2111 (2022). *Bruen* rejected the intermediate-scrutiny analysis adopted by nearly every Circuit (including the Ninth Circuit), in lieu of a text-and-history analysis. *Id.* at 2126. Under the new test, a plaintiff challenging a firearm regulation must first show that "the Second Amendment's plain text covers an individual's conduct" as relevant to the regulation. *Id.* If a plaintiff can make this showing, the burden then shifts to the defendant to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Plaintiffs cannot prove a likelihood of success on the merits of their Second Amendment claim because it fails at both steps. First, LCMs are not "arms" within the meaning of the Second Amendment. Rather, LCMs are detachable accessories that are not themselves "arms" or necessary for the functioning of



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

"arms." Moreover, the Second Amendment does not guarantee the right to keep or bear military-style weapons that are not appropriate for lawful self-defense. Second, Washington's law is part of a robust historical tradition of states and the federal government limiting the manufacture and sale of the weapons most commonly and destructively used for lawless interpersonal violence.

### 1. LCMs do not fall within the Second Amendment's text

#### a. LCMs are not "arms," and limiting their manufacture and sale does not infringe on any protected conduct

The initial inquiry under *Bruen* is whether the "plain text" of the Second Amendment "covers an individual's conduct." 142 S. Ct. at 2126. Plaintiffs largely skip this textual step, apparently assuming that the Second Amendment guarantees Mr. Brumback the right to purchase, and Gimme Guns the right to sell, as many LCMs as they want without restriction. *See* ECF No. 20 (Mot.) at 7–8; *see also id.* at 18 (incorrectly stating that the "lone inquiry" under *Bruen* is a historical one). Plaintiffs' assumption is wrong: the plain text of the Second Amendment does not cover LCMs, so Plaintiffs' claim fails at *Bruen*'s first step.

The Second Amendment provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court defined "arms" as "'[w]eapons of offence, or armour of defence'" or "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" 554 U.S. 570, 581 (2008)



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

(quoting Founding-era sources). LCMs are not themselves "weapons of offence, or armour of defence," nor are they used "to cast at or strike another." Instead, they are merely a subclass of "ammunition feeding device[s]"—accessories that, when added to weapons, make them more capable of mass murder. *See* Mot. at 21 (admitting that LCMs are "firearms accessories"). LCMs have no function independent of a firearm, nor are they necessary components of firearms—in fact, any firearm capable of accepting an LCM is also capable of accepting a magazine that can hold 10 rounds or fewer. Busse Decl. ¶ 4. For this reason, LCMs do not fit the Supreme Court's definition of "arms." *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment.").

Thus, to succeed on their claim, Plaintiffs must show SB 5078 otherwise interferes with their "right . . . to keep and bear arms." To be sure, restrictions on the possession of parts and products that are necessary in order to use firearms for lawful self-defense *may* implicate the Second Amendment. For example, in *Jackson v. City and County of San Francisco*, the Ninth Circuit explained that although the Second Amendment "does not explicitly protect ammunition, . . . without bullets, the right to bear arms would be meaningless," and thus "[a] regulation eliminating a person's ability to obtain or use ammunition" would infringe upon the Second Amendment right by "mak[ing] it impossible to use firearms for their core purpose." 746 F.3d 953, 967–68 (9th Cir. 2014). SB 5078,


ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

however, does no such thing. While a magazine may be required for some firearms to operate, a *large capacity* magazine is not. Busse Decl. ¶ 4. SB 5078 prohibits the manufacture and sale of one subclass of magazines commonly associated with mass shootings and other violent crime, but leaves untouched individuals' abilities to buy and sell ordinary magazines for use with any lawfully possessed firearm. SB 5078 also leaves individuals (including Mr. Brumback) free to possess and use the LCMs they already own. SB 5078 therefore does not meaningfully limit any individual's ability to use firearms for any lawful purposes. And although Mr. Brumback professes his "desire to purchase additional 'high capacity magazines,'" Mot. at 14, he does not and cannot demonstrate that any firearm he may own or choose to purchase in the future will be rendered inoperable if he is limited to purchasing only standard-capacity magazines—which remain widely available in Washington—going forward.[1]

**b. The Second Amendment does not protect military-style weapons, such as firearms equipped with LCMs**

Plaintiffs' Second Amendment claim fails at *Bruen*'s first step for a second, independent reason: the Second Amendment does not afford a right to keep and bear military-style weapons, including firearms equipped with LCMs.

---

[1] As explained below, Gimme Guns cannot show any infringement of its rights because "the Second Amendment does not independently protect a proprietor's right to sell firearms." *Teixeira v. County of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

"'[L]ike most rights, the right secured by the Second Amendment is not unlimited . . . [it] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *see also id.* at 2157 (Alito, J., concurring) (*Bruen* does not call into question restrictions on "the kinds of weapons that people may possess"). *Bruen* embraced the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). As the *Heller* Court explained, at the time of the Founding, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." 554 U.S. at 624. It was "these kinds of weapons (which have changed over the years) [that] are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia's armory), such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not." *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 408 (7th Cir. 2015) (citing *Heller*, 554 U.S. at 624–25); *see also Heller*, 554 U.S. at 627 (stating that "weapons that are most useful in military service—M–16 rifles and the like—may be banned"); *Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) (same). This textual-historical limitation is fatal to Plaintiffs' argument, as the Fourth and Seventh Circuits have recognized. *See Kolbe*, 849 F.3d at 135; *Friedman*, 784



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Case 1:22-cv-03093-MKD ECF No. 26 filed 11/25/22 PageID.766 Page 11 of 28

F.3d at 412.[2]

Notably, in *Kolbe*, the Fourth Circuit held that LCMs are not protected by the Second Amendment, relying on uncontroverted evidence to conclude that LCMs "are designed to enhance a shooter's capacity to shoot multiple human targets very rapidly"—a consummately, and uniquely, military function. 849 F.3d at 125 (quotation omitted). LCMs "are particularly designed and most suitable for military and law enforcement applications." *Id.* The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has made this determination repeatedly, over decades, in reports on the importability of certain weapons. *See* ATF, *Report and Recommendation of the Importability of Certain Semiautomatic Rifles*, 6 (July 6, 1989), https://www.atf.gov/file/61761/download ("[L]arge detachable magazines . . . provide[] . . . soldier[s] with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms."); ATF, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (Apr. 2018), https://www.atf.gov/resource-center/docs/guide/department-treasury-study-

---

[2] *Kolbe* and *Friedman* were both decided before *Bruen* abrogated the use of means–end scrutiny for Second Amendment claims. But because both decided that weapons equipped with LCMs are not protected under the Second Amendment's plain text, as informed by its history, their analysis on this point is consistent with and thus survives *Bruen*.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

sporting-suitability-modified-semiautomatic/download (it is a "military feature . . . to accept a large capacity military magazine"); ATF, *ATF Study on the Importability of Certain Shotguns* (Jan. 2011), https://www.atf.gov/resource-center/docs/january-2011-importability-certain-shotgunspdf/download (quoted in *Kolbe*, *supra*). The inherently military nature of LCMs was also a central concern of Congress when it banned the transfer or possession of new LCMs nationwide as part of the 1994 Assault Weapons Ban. As the House Report on the bill explained, "the expert evidence is that the features that characterize a semiautomatic weapon," including use of LCMs, "are not merely cosmetic, but do serve specific, combat-functional ends." H.R. Rep. No. 103-489 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1820. "High-capability magazines, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent." *Id.* "Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes." *Id.*

Befitting their role as tools of war, designed to kill as many enemies as possible, LCMs have limited—if any—utility for self-defense. *See Duncan v. Bonta*, 19 F.4th 1087, 1104–05 (9th Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). Indeed, "[s]tudies of 'armed citizen' stories collected by the National Rifle Association"—stories collected to highlight the supposed need for more guns—show that "that the average number of shots fired in self-defense

was [between] 2.2 and 2.1." *Kolbe*, 849 F.3d at 127; *see also* Allen Decl. ¶¶ 9-10, 16. According to Seattle Police Chief Adrian Diaz, while LCMs may be appropriate for certain law enforcement functions in "extremely rare" cases, "there is no place for large-capacity magazines in civilian self-defense." Diaz Decl. ¶¶ 11–15; *see also id.* at ¶ 18 ("In fact, firing more than a handful of rounds in self-defense may be dangerous because it increases the odds of a bystander being hit by a stray bullet[.]"); *see also* National Law Enforcement Partnership to End Gun Violence, *Partnership Report* (July 2021) at 70–71, https://www.policinginstitute.org/publication/national-law-enforcement-partnership-to-prevent-gun-violence-nleppgv-2010-2021-partnership-report/. Indeed, in 25 years with the Seattle Police Department, Chief Diaz could recall only *one* instance in which a civilian fired more than three rounds in what was even arguably self-defense. Diaz Decl. ¶ 16.

By contrast, LCMs are routinely used in mass shootings and other high-profile criminal activity to devastating effect, as the Legislature found. SB 5078, § 1; *see also* H.R. Rep. 117-346 (2022) at 21–22 (discussing, in detail, how "[l]arge capacity magazines have been used in many high-profile mass shootings"); *see also* Klarevas Decl., Table 2. According to Dr. Klarevas, one of the foremost experts on mass shootings, LCMs are "force multipliers when it comes to kill potential." *Id.* at ¶ 15. LCMs have been used in at least two-thirds of gun massacres since 1990, "result[ing] in a 58 percent increase in average fatalities per incident" compared to mass shootings that did not involve LCMs.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

*Id.* at ¶ 16.

In short, consistent with their purpose of "enhanc[ing] a shooter's capacity to shoot multiple human targets very rapidly," *Kolbe*, 849 F.3d at 125, LCMs are dangerous accessories "that are most useful in military service," *Heller*, 554 U.S. at 627, and therefore not protected by the Second Amendment.

Plaintiffs nonetheless suggest LCMs should be protected by the Second Amendment simply because there are a lot of them in the United States. Mot. at 6. Yet Plaintiffs' own complaint alleges that just 15% of all American adults have ever owned an LCM. ECF No. 1-4 ¶ 45. And almost a third of Americans live in states that restrict these items. Klarevas Decl. ¶ 20. In any case, whether LCMs are commonly *possessed* is irrelevant. The question under *Heller* is whether LCMs are in "common *use* . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 625. Here, the evidence shows they are not. Allen Decl. ¶¶ 9–10, 16.

Plaintiffs' popularity-contest argument also fails as a legal matter. As the Seventh Circuit pointed out in *Friedman*, Tommy guns were "all too common" during the Prohibition era, but this "popularity d[oes]n't give" dangerous military weapons "constitutional immunity." 784 F.3d at 408. Indeed, *Heller* makes clear that "[t]here is no Second Amendment protection for . . . 'weapons that are most useful in military service'"; it does not "make[] an exception for such weapons if they are sufficiently popular." *Kolbe*, 849 F.3d at 142 (quoting *Heller*, 554 U.S. at 627). Plaintiffs' argument leads to the absurd conclusion that a firearm accessory's constitutionality turns on whether the gun industry chooses to engage



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

in mass campaigns to flood the market. *See* Busse Decl. ¶¶ 3, 6–7. Moreover, "relying on how common a weapon is at the time of litigation would be circular" because a weapon's popularity (or not) often depends on whether it is banned or not. *Friedman*, 784 F.3d at 409; *see also Kolbe*, 849 F.3d at 141.[3]

*Fyock v. Sunnyvale* is not to the contrary. *Contra* Mot. at 17–18. There, the court—while upholding a ban on LCMs—noted that "to the extent that certain firearms capable of use with a magazine . . . are commonly possessed by law-abiding citizens for lawful purposes, . . . there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock*, 779 F.3d at 998. Here, though, Plaintiffs do not allege that *any* firearms are rendered inoperable by SB 5078's restrictions. Nor could they, for the reasons discussed above. Further, *Fyock* explicitly notes that any right to possess magazines is "not unfettered." *Id.* at 998 (echoing *Heller*, 554 U.S. 626). By limiting only the manufacture and sale of only the most dangerous magazines, while otherwise leaving individuals free to possess as many standard-capacity magazines and as much ammunition as they desire, Washington's law plainly does not infringe any right to keep or bear arms.

---

[3] Plaintiffs rely on the district court's opinion in *Fyock* to support their "common use" argument (Mot. at 17–18), but on review, the Ninth Circuit expressly cast doubt on this portion of the district court's opinion. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

### 2. SB 5078 is part of a robust historical tradition of regulating weapons commonly used in lawless interpersonal violence

SB 5078 is consistent with a long history and tradition in the United States of regulating weapons associated with interpersonal violence. Thus, even if the manufacture and sale of LCMs were arguably protected under the Second Amendment's text (and they are not), the law still satisfies *Bruen*'s second step.

If a regulation falls within the Second Amendment's text, *Bruen*'s second step requires courts to examine whether the regulation "is consistent with the Nation's historical tradition of firearms regulation." 142 S. Ct. at 2126. This analysis requires a "nuanced approach," focusing on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132–33. The "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

This analysis requires extensive and novel historical research and analysis. Rivas Decl. ¶¶ 4–7; Spitzer Decl. ¶¶ 4–5; Cornell Decl. ¶¶ 7–12. Defendants have engaged expert historians to provide evidence on precisely this issue, and those experts have begun (but not completed) the work required to place SB 5078 in historical context. *Id.* But even at this early stage, the available information shows that Plaintiffs are unlikely to prevail on the merits because SB 5078 is consistent with the nation's history and tradition of weapons regulations.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

**a. States have long regulated weapons that contribute to lawless violence**

SB 5078 follows a long American tradition of regulating weapons that contribute to interpersonal violence when they proliferate. Since the Founding, the same basic pattern has repeated itself. First, someone invents a firearm or firearm accessory. Spitzer Decl. ¶ 6. At first, there is no impact on society. And for weapons such as the Puckle Gun, which never make it beyond a prototype, or the 1891 Browning .45 cited by Plaintiffs (*see* Mot. at 4) that also never saw production, their impact remains negligible. *Id.* However, if the technology can be readily manufactured and works as intended, the military will often adopt it. *Id.* at ¶ 7. Afterward, military-style weapons often wind up on the commercial market and pass into civilian use. If so, they sometimes (though not always) contribute to criminal violence that terrorizes the public. Here is where, time and again, states decide to regulate the weapons. *Id.* at ¶ 8.

This three-phase pattern shows how, throughout history, weapons have typically been regulated if their spread leads to widespread societal problems. Weapons regulations that follow this pattern are useful analogues because they are "comparably justified" as a response to changing technology and new threats of violence and terror, and they "impose a comparable burden on the right of armed self-defense" by leaving law-abiding citizens free to access and use other weapons appropriate for that purpose. *Bruen*, 142 S. Ct. at 2133.

**b. SB 5078 resembles historical and traditional analogues**

Regulations of revolvers in the 19th century and machine guns in the early 20th century follow the same pattern, emerging as analogues to SB 5078.[4]

The first practical and reliable multi-shot revolver pistol was invented by Samuel Colt in the 1830s. Rivas Decl. ¶ 10; Spitzer Decl. ¶ 8. But it was not until several decades later that government patronage gave him a market for his pistol, first from Southern states in the lead-up to secession, and then from the Union after the Civil War began. Spitzer Decl. ¶¶ 8–9; Rivas Decl. ¶ 10. The war prompted the creation of the infrastructure necessary to manufacture staggeringly large quantities of pistols. *Id.* This, in turn, ultimately made these weapons available to and affordable for American consumers. *Id.*

The spread of cheaper pistols through the country introduced, for the first time in U.S. history, rampant gun violence. Rivas Decl. ¶¶ 10–11; Spitzer Decl. ¶ 9. In response, states enacted laws barring concealed carry, open carry, and the brandishing or display of weapons, as well as deterrent measures such as high occupation and sales taxes. Spitzer Decl. ¶ 9; Rivas Decl. ¶ 13. In the 1880s, some states specifically regulated "pocket pistols"—a subclass of the Colt six-shooter—in a way closely resembling SB 5078. Rivas Decl. ¶¶ 18–20. Pocket pistols were small firearms designed to be concealed from public view and, like

[4] These are by no means the only two analogues; they are used here for illustrative purposes at this early stage of the litigation. Spitzer Decl. ¶¶ 19–20.

LCMs, were often used to commit lawless interpersonal violence and create a climate of increased public fear. *Id.* at ¶ 19. In response, state legislatures singled out these particular weapons for stricter regulation. For example, sales of pocket pistols to the general public were prohibited by both Tennessee and Arkansas in 1881, even as these states continued to allow the sale of the larger, less concealable versions of the Colt pistol that did not present the same danger or pose the same threat to public safety and well-being. *See id.* at ¶¶ 15–20. By preserving access to other types of firearms, the restrictions on pocket pistols imposed a minimal burden on the right of armed self-defense. These laws remained in force well into the 20th century. *Id.* at ¶ 19.

This same pattern repeated itself in the regulation of machine guns. Weapons capable of firing rounds in rapid succession can be traced to guns of the late 19th and early 20th centuries. Spitzer Decl. ¶ 10. The modern-day machine gun was initially used solely by the military. *Id.* at ¶ 7. But at the conclusion of World War I, manufacturers of machine guns needed a new market for their invention and began to market the machine gun to civilians. *Id.* The most famous of these was the Tommy gun, capable of holding up to 100 rounds. *Id.* These guns were advertised to the public as the "ideal weapon for the protection of large estates, ranches, plantations, etc." *Id.* at Ex. A. Instead, however, these guns caused fear and public outcry due to their use in high-profile robberies and gangland shootings. *Id.* at ¶ 10. Ultimately, 30 states banned machine guns, and the 1934 National Firearms Act sharply limited their circulation by imposing a


ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

$200 tax, at a time when the average annual income was $1780.[5] *Id.* This resulted in sales virtually ceasing by 1937. *Id.* Subsequently, in 1968, Congress banned the import of machine guns into the United States, and in 1986, Congress banned the transfer or possession of any machine gun unless it was lawfully possessed before 1986. Pub. L. Nos. 90-618 and 99-308 (1968). These restrictions are wholly consistent with the Second Amendment. *See Heller*, 554 U.S. at 624.

These examples highlight that the regulation of new and dangerous firearm technology is a *repeating* pattern throughout our history, from the adoption of the Fourteenth Amendment to the twentieth century and beyond. SB 5078 continues this tradition: it follows the same basic historical pattern, responds to the same essential concerns, and creates a comparably minimal burden on the right to self-defense. Although LCMs in their modern form first emerged as military items several decades ago, they did not begin to cause widespread social harm until much later.[6] In the late 1980s, LCMs first became linked to crime and mass shootings, leading to their inclusion in the Federal Assault Weapons Ban in 1994.

---

[5] https://www.washingtonpost.com/history/2019/08/09/they-were-killers-with-machine-guns-then-president-went-after-their-weapons/.

[6] Plaintiffs cite to weapons predating this period, Mot. at 4–5, but all were either lever or bolt action (*i.e.*, did not involve magazines); held ten or fewer rounds; or, in the case of the supposed "[p]istols" with "20 round magazines as early as 1893," are factually inaccurate. *See id.* and sources cited therein.

Spitzer Decl. ¶¶ 14–15; H.R. Rep. 103-489 (discussing high-profile shootings involving LCMs). Following the lapse of that ban in 2004, LCMs reemerged as a social threat—and in particular, starting in 2007, the gun industry made a concerted push to aggressively market and sell LCMs and assault weapons to the civilian public. Busse Decl. ¶ 3. Since then, as LCMs have become more common and more civilians have obtained the military capability to fire more than 10 rounds without reloading, their use in mass shootings and other heinous crimes has had devastating results. Klarevas Decl. ¶¶ 8–18. Although mass murder is as old as time, gun massacres are a modern phenomenon that is getting worse—driven by the proliferation of military-style weapons and accessories. *Id.* From Newtown to Las Vegas, Parkland to Tucson, Orlando to Uvalde, over and over again, LCMs have enabled the most horrific mass shootings of our time. *Id.*, Table 2; H.R. Rep.117-346 at 21–22.

Like the revolver bans of the Reconstruction era and the machine gun bans a few decades later, SB 5078 is a narrow limitation on a particular type of hardware associated with high-profile violence and public terror, and it imposes a minimal (if any) burden on legitimate self-defense. Because SB 5078 is analogous to historical weapons regulation in the United States, Plaintiffs cannot meet their burden to show a likelihood of success on their Second Amendment claim, and their request for a preliminary injunction should be denied.

**3. Plaintiffs' state constitutional claim lacks merit**

Plaintiffs also cannot show that the SB 5078 violates article I, section 24



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

of the Washington Constitution—nor do they make any attempt to do so in their Motion. "[T]he firearm rights guaranteed by the Washington Constitution are distinct from those guaranteed by the United States Constitution" and "should be interpreted separately from the Second Amendment to the federal constitution." *State v. Jorgenson*, 312 P.3d 960, 963 (Wash. 2013). The article I, section 24 test asks, first, whether the regulation is "reasonably necessary to protect public safety and substantially related to legitimate ends sought." *Id.* at 156. Courts then "balance the public benefit from the regulation against the degree to which it frustrates the purpose of the constitutional provision." *Id.*

Plaintiffs do not discuss or attempt to meet this standard, and so have failed to carry their burden to demonstrate a likelihood of success. Nor could they. At step one, SB 5078 is substantially related to its purpose of protecting the public health and safety of Washingtonians, specifically from the well-established dangers of LCMs used in mass shootings and other violent crime, by prospectively limiting their sale. *See* SB 5078, § 1; Klarevas Decl. at ¶¶ 17–26.

At step two, SB 5078 has a clear public benefit and does not unduly frustrate the purpose of article I, section 24 for at least three reasons. First, SB 5078 only bars the manufacture and sale of a subset of particularly deadly accessories, leaving Washingtonians free to choose any lawful firearm they want to protect themselves so long as its magazine holds 10 rounds or fewer. Studies of armed self-defense incidents show that the average number of shots fired is around 2.2. Allen Decl. ¶ 9. Experienced law enforcement rarely use more than



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

10 rounds in their armed encounters. Diaz Decl. ¶13. By contrast, "there is no place for large-capacity magazines in civilian self-defense" because it only takes a few rounds to drive away an aggressor. *Id.* at ¶ 15. Second, SB 5078 does not ban the possession of LCMs, so individuals who already lawfully possess LCMs, including Mr. Brumback, may continue to do so. Third, LCMs are not "arms" under the Washington Constitution, under which "arms" are "instruments that are designed as weapons traditionally or commonly used by law abiding citizens for the lawful purpose of self-defense." *City of Seattle v. Evans*, 366 P.3d 906, 913 (Wash. 2015) (holding straight-blade knives are not protected "arms"). Again, detachable magazines are not weapons, they are accessories—and a firearm will function perfectly well with a standard-capacity magazine. *Supra* at B.1.a.

## C. Plaintiffs Face No Irreparable Harm

Plaintiffs' Motion must also be denied because, regardless of the merits of their claims, neither Mr. Brumback nor Gimme Guns will suffer any irreparable harm while this litigation is pending. Plaintiff Brumback—a long-time owner of multiple LCMs, *see* Mot. at 17; ECF No. 1-8 ¶¶ 13, 31—cannot be irreparably harmed by a law that has no effect whatsoever on the LCMs he already possesses. Even assuming for argument's sake that there were a constitutional right to "keep and bear" LCMs, such a right is unaffected by SB 5078, which does not prohibit or restrict the possession of LCMs. *See Heller*, 554 U.S. at 582 ("[T]he most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'"). And Mr. Brumback does not assert that he requires additional LCMs to



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

adequately equip himself for lawful self-defense—nor could he credibly do so. *See supra* at 10–11. Though Mr. Brumback may not sell his LCMs or add to his collection, *see* Mot. at 17, those inconveniences pose no constitutional emergency warranting the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.

Gimme Guns's only asserted injury is that it is "prohibited from selling" LCMs. Mot. at 18–19. Such "monetary damages" are by definition not irreparable. *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1073 (9th Cir. 2014). Nor has Gimme Guns suffered any constitutional injury, because—even if one assumes that LCMs are "arms," which they are not—the right to "keep and bear" arms does not encompass the right to sell them. "Nothing in the specific language of the [Second] Amendment suggests that sellers fall within the scope of its protection," and "no historical authority suggests that the Second Amendment protects an individual's right to *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms." *Teixeira*, 873 F.3d at 687, 683, 686–87. Because Gimme Guns's rights as a seller are nonexistent, or at least no greater than its customers' rights as buyers, *id.* at 682, it fails to show irreparable harm.

Plaintiffs' long delay in filing their Motion further underscores the absence of harm. SB 5078 was signed into law in March 2022 and went into effect on July 1. Though Plaintiffs could have moved for a preliminary injunction at that time, they instead waited for more three months after SB 5078 went into effect, and over two months after removal to this Court. Delays of two months, or waiting



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

until a challenged measure has gone into effect, connote a lack of urgency and indicate an absence of irreparable harm. *See, e.g.*, *Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688, at *9 (D.N.J. Nov. 8, 2021) ("the fact that Plaintiffs waited nearly two (2) months to seek relief dispels any claim of irreparable harm"); *Wise v. Inslee*, 2:21-cv-0288-TOR, 2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021) (no irreparable harm where Plaintiffs filed their complaint nearly two months after the challenged measure was published and moved for a preliminary injunction eleven days after the measure went into effect); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("Plaintiffs' long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm") (citation and internal quotation marks omitted). And while Plaintiffs filed *a* motion for preliminary relief with the state court months after SB 5078 was signed into law (ECF Nos. 1–5), they made no effort to re-note or re-file it in this Court until August 31, 2022, more than a month after removal. Simpson Decl., Ex. A. A preliminary injunction would not preserve the status quo, but would improperly and needlessly turn back the clock by several months.

**D. The Equities and Public Interest Weigh Heavily Against an Injunction**

Plaintiffs agree that "[w]hen a party seeks a preliminary injunction against the government, the balance of the equities and public interest factors merge." Mot. at 16 (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). But they fail to show that these factors weigh in their favor. First, since Plaintiffs' constitutional claims lack merit, their assertion that "protecting


ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

constitutional rights is in the public interest" falls flat. Mot. at 21–22. Second, Plaintiffs ignore the Legislature's well-substantiated findings that LCMs are used to commit mass shootings and other violent crimes, while callously minimizing the deaths of gun-violence victims in Washington. *Id.* at 19–20. Plaintiffs attempt to contrast gun deaths with traffic fatalities, drug overdoses, and disease, *id.*—but all are significant social problems that the Legislature has appropriately acted to address. *See, e.g.*, Wash. Rev. Code § 43.59 (traffic safety); S.B. 5380, ch. 314, 2022 Wash. Sess. Laws (opioid use disorder treatment and prevention); Wash. Rev. Code § 70.26 (pandemic influenza preparedness). SB 5078, too, targets a threat to public health and safety, and the equities and public interest weigh strongly against enjoining it. While no single measure can "alone stop gun violence," Mot. at 21, restrictions on LCMs are demonstrably effective, while LCMs' proliferation has increased mass-shooting incidents, injuries, and deaths. *Supra* at 11; Klarevas Decl. at 17–26. The equities and public interest also weigh strongly against the sweeping injunction against *any* enforcement of SB 5078 that the two Plaintiffs seek. *See E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855–56 (9th Cir. 2020) (relief should be no broader "than necessary to provide complete relief to the plaintiffs before the court"). Plaintiffs' failure to satisfy these factors independently forecloses their request for injunctive relief.

## IV. CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

DATED this 24th day of October 2022.

ROBERT W. FERGUSON
Attorney General

*s/ Andrew Hughes*
ANDREW HUGHES, WSBA #49515
R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470
July.Simpson@atg.wa.gov
William.McGinty@atg.wa.gov
Andrew.Hughes@atg.wa.gov
Brian.Rowe@atg.wa.gov
Jeffrey.Even@atg.wa.gov
Kristin.Beneski@atg.wa.gov
*Attorneys for Defendants*
*Robert W. Ferguson and John R. Batiste*

**PROOF OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of October 2022 at Seattle, Washington.

*s/ Andrew Hughes*
ANDREW HUGHES, WSBA #49515



ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# EXHIBIT C

Eric B. Wolff, WSBA No. 43047
David A. Perez, WSBA No. 43959
Michelle L. Maley, WSBA No. 51318
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000
Attorneys for Defendant
NAPHCARE, INC.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

THE ESTATE OF CINDY LOU HILL, by and through its personal representative, Joseph A. Grube,

Plaintiff,

v.

NAPHCARE, INC., an Alabama corporation; and SPOKANE COUNTY, a political subdivision of the State of Washington,

Defendants.

No. 2:20-CV-00410

**NaphCare's Reply in Support of Motion for Judgment as a Matter of Law, New Trial, and/or Remittitur**

**Hearing Date: November 16, 2022**

## Table of Contents


**Page**

ARGUMENT ........ 2

I. There is insufficient evidence of any "custom" of sending seriously ill inmates to "Medical Watch," which is also not what the nurse thought she was doing, and the erroneous *Monell* instruction was prejudicial. ........ 2

A. There was insufficient evidence of proper *Monell* liability. ........ 3

1. Insufficient evidence of an unconstitutional practice. ........ 3

2. Insufficient evidence of deliberate indifference. ........ 5

3. Insufficient evidence of causation. ........ 6

B. The jury was incorrectly instructed on *Monell* liability. ........ 6

II. The failure to bifurcate unfairly prejudiced NaphCare. ........ 9

III. The $24 million punitive damages award is contrary to controlling case law; the ceiling is 1:1 without counting attorneys' fees; and Plaintiff provides this Court inapt cases that cannot be relied upon. ........ 9

A. The maximum ratio is 1:1. ........ 9

B. The punitive award is unprecedented. ........ 11

C. Potential attorneys' fees are irrelevant. ........ 11

D. None of Plaintiff's remaining arguments justify this award. ........ 12

CONCLUSION ........ 12




**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# Table of Authorities

**Page(s)**

**CASES**

*Aleo v. SLB Toys USA, Inc.*,
995 N.E.2d 740 (Mass. 2013) ....................10

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997)....................7

*Bearchild v. Cobban*,
947 F.3d 1130 (9th Cir. 2020)....................7

*Dean v. Wexford Health Sources, Inc.*,
18 F.4th 214 (7th Cir. 2021)....................6

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002)....................4

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008)....................10, 11

*Gordon v. County of Orange*,
6 F.4th 961 (9th Cir. 2021)....................1, 5, 6, 7

*Henry v. County of Shasta*,
132 F.3d 512 (9th Cir. 1997)....................5, 6

*Sandoval v. County of San Diego*,
985 F.3d 657 (9th Cir. 2021)....................4, 6

*Sharif v. Ghosh*,
No. 12 C 2309, 2014 WL 1322820 (N.D. Ill. Apr. 1, 2014) ....................5



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Smith v. Wade*,
461 U.S. 30 (1983)....................10

*State Farm Mut. Auto. Ins. v. Campbell*,
538 U.S. 408 (2003)....................9, 10, 11

*TXO Prod. Corp. v. All. Res. Corp.*,
509 U.S. 443 (1993)....................11

*United States v. Hegwood*,
977 F.2d 492 (9th Cir. 1992)....................7

*United States v. Paul*,
37 F.3d 496 (9th Cir. 1994)....................7

*United States v. Warren*,
984 F.2d 325 (9th Cir. 1993)....................7, 8

*Willow Inn, Inc. v. Pub. Serv. Mut. Ins.*,
399 F.3d 224 (3d Cir. 2005)....................11

**OTHER AUTHORITIES**

Ninth Cir. Jury Instrs. Comm., *Manual of Model Civil Jury Instructions* (2017 ed. updated 2022) ("Manual")....................8



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Plaintiff's defenses of *Monell* liability and the grossly disproportionate punitive damages award are contrary to the evidence and controlling case law. Indeed, much of Plaintiff's brief directs this Court to clearly inapplicable or superseded cases.

NaphCare's nurse made a tragic mistake in failing to call an advanced clinical provider because she erroneously thought Ms. Hill presented a case of opioid withdrawal, a mistake for which Plaintiff has been compensated $2.75 million. For *Monell* liability, however, Plaintiff counter-factually asserts that the nurse was following a "custom" of not sending inmates with medical emergencies to a hospital but to "Medical Watch" instead. That theory has no basis in evidence, and is then a launching pad for Plaintiff to cite inapplicable case law.

The nurse obviously did not think she was dealing with a medical emergency, so the hypothesized "custom" cannot apply. Having framed an inapt "custom," Plaintiff then relies upon case law for *facially unconstitutional* policies and insists that there is no burden to identify other, similar incidents to demonstrate an unconstitutional practice and NaphCare's "deliberate indifference." But case law for facially unconstitutional policies cannot apply because Plaintiff conceded NaphCare's policies are facially constitutional. Tr.772, 793, 877. Thus, Plaintiff *must* produce evidence of "similar conduct or constitutional violations," *Gordon v. County of Orange*, 6 F.4th 961, 974 (9th Cir. 2021), to show a pattern of mistakes under otherwise lawful policies that were deliberately ignored. Plaintiff cannot meet that controlling standard and does not even attempt to. As this Court recognized, Ms. Hill's death was not "precipitated by instances of other individuals receiving inadequate medical



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

care on medical watch." ECF.293 at 7. The *Monell* verdict cannot stand.

Neither can the punitive damages award. The compensatory award here was substantial. A 1:1 cap on punitives applies as both a matter of constitutional law and federal common law. Further, NaphCare challenged Plaintiff to offer any comparable case of *Monell* liability where a punitive award of this proportion was sustained. NaphCare could not find such an example, and apparently neither can Plaintiff.

The Court should grant judgment for NaphCare on *Monell* liability, or in the alternative grant a new trial. In the event the Court sustains *Monell* liability, the punitive award should be reduced to the 1:1 ceiling, excluding attorneys' fees, which cannot count to the "compensatory" component in a Section 1983 case.

## ARGUMENT

### I. There is insufficient evidence of any "custom" of sending seriously ill inmates to "Medical Watch," which is also not what the nurse thought she was doing, and the erroneous *Monell* instruction was prejudicial.

Plaintiff's defense of *Monell* liability is an untrustworthy jumble of confusing descriptions of NaphCare's supposedly unconstitutional "custom" (a problem from trial, Tr.798–803, 816–20) and inapplicable cases involving facially unconstitutional policies. The evidence does not support *Monell* liability for the only theory that could possibly apply: a theory that NaphCare's facially constitutional policies or practices nevertheless got misapplied repeatedly and NaphCare knew it and ignored it. Plaintiff refuses to defend that *Monell* theory, the evidence does not remotely support it, and the erroneous jury instruction absolutely compounded the confusion.



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

### A. There was insufficient evidence of proper *Monell* liability.

JMOL is warranted because there was insufficient evidence of liability. But the Court should at least grant a new trial after independently assessing the evidence because the verdict is against the weight of that evidence. ECF.286 at 7–8, 11.

#### 1. Insufficient evidence of an unconstitutional practice.

Since Plaintiff concedes that "the practice of using jail guards to keep an eye on sick people is perfectly fine," Tr.877, Plaintiff had to show a *practice of allowing patients with urgent medical needs to be sent to "Medical Watch."* The evidence was wholly insufficient to make that showing. Plaintiff relied on Nurse Gubitz's deposition statement—introduced solely for impeachment, *not as substantive evidence*—that Medical Watch was "used for patients who needed acute medical monitoring." Dep.170; ECF.286 at 16. She used "acute" to mean sick or ailing now as distinguished from "chronic," such as needing wheelchairs or other accommodations for more permanent conditions. Nurse Gubitz repeatedly clarified that distinction at trial despite Plaintiff's counsel's efforts to twist her words, Tr.647–49, 675, 687, 692, 734–35, and explained that *seriously* ill patients would be sent to the hospital, Tr.648. Plaintiff also points to Dr. Roscoe's conclusion that "acutely ill" inmates were sent to Medical Watch, but the only basis for that conclusion was Nurse Gubitz's deposition statement; Dr. Roscoe said that "the testimony by Nurse Gubitz was that their acute medical patients were placed on medical watch." Tr. 204–06.

There was no other evidence. An isolated and ambiguous deposition statement tortured by counsel and an expert for an *ipse dixit* opinion on an ultimate issue is not



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

sufficient evidence. *E.g.*, *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (opinion may be excluded when only expert's *ipse dixit* connects evidence/data and opinion). The other testimony cited (at 3–7) has nothing to do with sending patients with health emergencies to Medical Watch. Plaintiff now points to the *County*'s "Medical Watch" form (at 4, 6), but the County's form was for *all* mildly-ill patients in "Medical Watch" and simply listed obvious symptoms easily observable by non-medical personnel. The existence of the form in no way suggests that NaphCare had a practice of sending patients with *medical emergencies* to "Medical Watch."

Plaintiff cites *Sandoval v. County of San Diego*, 985 F.3d 657 (9th Cir. 2021), in arguing (at 7–8) that other harmful mistakes are not required to establish an unconstitutional *practice*, but Plaintiff is mixing up two different things. *Sandoval* says that proof of prior injury is not necessarily required to establish *deliberate indifference* because "constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur." *Id.* at 682. In other words, as explained in NaphCare's motion (at 16–19), deliberate indifference may be shown by proof that the municipality ignored an *obvious* danger.

Plaintiff's embrace of *Sandoval* conclusively demonstrates how Plaintiff is cheating on the proper standard. *Sandoval* is for showing deliberate indifference where it is *obvious* constitutional injuries will occur. But here, Plaintiff has conceded "Medical Watch" was facially "fine"; it was only *known errors* in application that could make it unconstitutional. "Where no argument exists that the express policies



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

themselves [are] unconstitutional," plaintiff must produce evidence of "similar conduct or constitutional violations." *Gordon*, 6 F.4th at 974. That is only logical: a single instance is insufficient to establish a *practice*. *Id.* Here, Plaintiff failed to introduce evidence of a *practice* of sending patients with urgent or emergent medical needs to Medical Watch. (Nor did any such evidence exist as this is not and was not at any time NaphCare's policy or practice.)

**2. Insufficient evidence of deliberate indifference.**

Because there was no evidence of a pattern of mistakes, there was, unsurprisingly, no evidence of deliberate indifference to a pattern of mistakes. Plaintiff cites (at 9) an unpublished case for the proposition that "deliberate indifference may be established by demonstrating departure from professional judgment, practice, or standards." *Sharif v. Ghosh*, No. 12 C 2309, 2014 WL 1322820, at *3 (N.D. Ill. Apr. 1, 2014). *Sharif* relied on a case saying an *individual nurse's* extreme departure from such standards might suggest *her* deliberate indifference; one nurse's mistake cannot show the *organization's* deliberate indifference to a *pattern*.

Plaintiff's attempt (at 4–5, 9–10) to show deliberate indifference via supposed post-incident inaction also fails. There was no evidence that Nurse Gubitz had a history of misconduct or malpractice that would warrant terminating her employment. Nor was there evidence that NaphCare failed "to correct a blatantly unconstitutional course of treatment," as in *Henry v. County of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997). There, on at least four separate occasions, groups of officers participated in



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

holding detainees naked in urine-soaked rubber rooms in retaliation for minor compliance failures. Unlike in *Henry*, NaphCare's practices are perfectly acceptable so long as nurses summon higher-level medical help when warranted, as the evidence shows they did (and do) in all but the instant case. Indeed, had NaphCare changed its practices, Plaintiff would surely point to those changes as evidence that the practices needed fixing. *See Sandoval*, 985 F.3d at 683; *Gordon*, 6 F.4th at 974 n.7.

Just as in *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021), Plaintiff failed to show deliberate indifference to either a pattern of constitutional violations or an obviously dangerous practice. *Wexford* is directly on point notwithstanding Plaintiff's feeble and flawed attempt to distinguish it (at 10).

#### 3. Insufficient evidence of causation.

Plaintiff's causation argument is based on the notion that if there had been no "Medical Watch" area in the jail, Nurse Gubitz would have had to summon higher-level medical assistance for Ms. Hill. Opp.11. That makes no sense. No Medical Watch almost certainly would have meant keeping Ms. Hill in her original cell on the existing monitoring protocols (COWS/safety checks) because of the mistaken belief that Ms. Hill was suffering from opioid withdrawal. The mere existence of Medical Watch cannot prove causation. *See* ECF.286 at 19–21.

### B. The jury was incorrectly instructed on *Monell* liability.

Plaintiff *concedes* it "was not required to prove the company's 'deliberate indifference'" under the instructions given the jury. Opp.8. That omission impermissibly relieved Plaintiff of proving an element and improperly invited the jury to hold



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

NaphCare liable by *respondeat superior*. Omitting an element of liability is reversible plain error. *United States v. Warren*, 984 F.2d 325, 327–28 (9th Cir. 1993).

Relying upon its inapt depiction of this case as if there were a facially unconstitutional policy, Plaintiff contends that proof of NaphCare's deliberate indifference was not necessary. Incorrect. Proof of deliberate indifference is absolutely required where, as here, plaintiff alleges that the municipality failed to rectify a pattern of unconstitutional actions by municipal employees. *E.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 400, 403–15 (1997); *Gordon*, 6 F.4th at 973–74. Where plaintiff contends that a facially lawful municipal action or a municipal failure to act led an employee to violate plaintiff's rights, plaintiff must show that the action or inaction "was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 403, 407. That showing is necessary to establish municipal notice, fault, and causation, and also to ensure the municipality is not held liable under *respondeat superior*. *Id.*; ECF.286 at 8–21. Plaintiff cites no case to the contrary. *See* Opp.24–26.

That instructions were based on Model Instructions (at 26-27) is irrelevant. The models are not binding, may be erroneous on their face or as applied, and "must be reviewed carefully before use in a particular case." Introduction to Manual (Manual); *Bearchild v. Cobban*, 947 F.3d 1130, 1148 (9th Cir. 2020) (same); *United States v. Paul*, 37 F.3d 496, 500–01 (9th Cir. 1994) (plain error in model instructions); *United States v. Hegwood*, 977 F.2d 492, 496 (9th Cir. 1992) (same). The instructions given did not accurately state the law *for this case*. Instruction No. 31 was based on Model



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Case 2:20-cv-00410-MKD ECF No. 322 filed 01/26/26 PageID.51806 Page 12 of 20

Instruction 9.5, which should be used "only when *Monell* liability is based on an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant that is alleged either to be itself unlawful or to direct employees to act in an unlawful manner." Manual § 9.5 cmt.

But this is not a case with a facially unconstitutional policy, practice, or directive. Plaintiff concedes "Medical Watch" is facially constitutional and then rejects being forced to prove longstanding unconstitutional mistakes. Thus, 9.5 either should have been modified by adding the deliberate-indifference element or replaced with Model Instruction 9.8 (liability based on a policy/practice that fails to prevent violations). As given, the instruction omitted the critical element of NaphCare's culpability, a problem compounded by Instruction 32, which referred only to *Nurse Gubitz's* culpable conduct—a prerequisite for liability, but problematic given the error in Instruction 31 because it further entwined NaphCare with Nurse Gubitz and heightened the risk of an improper verdict based on *respondeat superior*.

Plaintiff illogically argues that the error was harmless because the jury awarded punitives. The failure to instruct on every element of liability is harmless "only if the omitted element is undisputed, and, therefore, its omission could not possibly have been prejudicial." *Warren*, 984 F.2d at 327 (citation omitted). Whether NaphCare was deliberately indifferent was very much disputed. Moreover, the error infected the punitive award by creating confusion regarding what and whose conduct the award was supposed to punish. It is overwhelmingly likely that the jury improperly held NaphCare responsible under *Monell* and for punitives for the results of one



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

nurse's error.

## II. The failure to bifurcate unfairly prejudiced NaphCare.

For the reasons explained in NaphCare's motion (at 22–24), the prejudice resulting from the failure to bifurcate requires a new trial. Plaintiff's counterarguments (at 29–30) are without merit. The jury deciding NaphCare's liability was told that NaphCare's interconnected co-defendant had already been found liable for violating Ms. Hill's constitutional rights on overlapping facts. No limiting instruction or objection could cure the prejudice resulting from that information. (Spokane County's defense of non-bifurcation is conclusory and patently self-serving.)

## III. The $24 million punitive damages award is contrary to controlling case law; the ceiling is 1:1 without counting attorneys' fees; and Plaintiff provides this Court inapt cases that cannot be relied upon.

NaphCare challenged Plaintiff to offer one credibly similar case of punitive damages for *Monell* liability by which the award here could be sustained. ECF.286 at 28. Plaintiff does not cite a single *Monell* case awarding punitive damages, let alone a *Monell* case involving similarly exorbitant punitives. The unprecedented and facially unconstitutional $24 million award cannot stand.

### A. The maximum ratio is 1:1.

Where, as here, compensatory damages are substantial, a 1:1 ratio of punitive to compensatory damages is generally "the outermost limit of the due process guarantee." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 425 (2003). Moreover, a lower ratio is the norm. Studies covering "cases of the most as well as the least blameworthy conduct triggering punitive liability . . . put the median ratio for the



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

entire gamut of circumstances at less than 1:1." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 512 (2008). The median ratio of 0.65:1 is appropriate for cases "with no earmarks of exceptional blameworthiness" and "without the modest economic harm or odds of detection that have opened the door to higher awards." *Id.* at 513. Even for outliers, a 1:1 ratio "is a fair upper limit." *Id.*

Plaintiff asks the Court to ignore *Exxon* but cannot wish it away. Opp.12–13. Section 1983 permits punitive damages because the common law permits punitive damages. *See Smith v. Wade*, 461 U.S. 30, 34–35 (1983). A 1:1 ceiling applies as a matter of federal common law where compensatory damages are substantial. *Exxon*, 554 U.S. at 512–13. Accordingly, by a logical syllogism that Plaintiff does not refute, common law punitive damages in Section 1983 cases must have a 1:1 ceiling where compensatory damages are substantial. District court cases to the contrary and dicta from an overruled Ninth Circuit case are simply wrong. In any event, *Exxon* follows from *State Farm*, which unquestionably applies here.

Contrary to Plaintiff's assertion (at 20), there is no serious dispute that a $2.75-million compensatory award is substantial. Plaintiff cites one wrongful-death case, *Aleo v. SLB Toys USA, Inc.*, 995 N.E.2d 740, 757 (Mass. 2013), saying that $2.64 million "pales" in significance compared to "the loss of a young woman's life," but even that case does not squarely state that such an award is insubstantial for the purpose of determining the appropriate *State Farm* ratio. Plaintiff cites no other case saying that a $2.75-million award is not "substantial."



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

### B. The punitive award is unprecedented.

Plaintiff cites no *Monell* cases, and the cases it does cite (presumably after an exhaustive search) involve (1) nominal or insubstantial (less than $50,000) compensatory damages; (2) intentional malice, deceit, and/or repeated wrongdoing; and/or (3) non-Section 1983 claims. *See* Exhibit A; Opp.12–22. And because Plaintiff cannot find any correctional healthcare award nearly as high, it argues that the Supreme Court "discourages" the comparison of "gross awards." Opp.21–22 (citing *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 458 (1993)). This Court cannot rely upon *TXO*; it is superseded by *State Farm* and more recent cases. Courts absolutely should consider the difference between punitive damages and "the civil penalties authorized or imposed in comparable cases," *State Farm*, 538 U.S. at 418, as well as "what juries and judges have considered reasonable" in comparable cases, *Exxon*, 554 U.S. at 512. Plaintiff cites only a law authorizing no civil monetary penalties, Opp.21, and cites no similar case upholding an award of this size, *id.* at 17–20.

### C. Potential attorneys' fees are irrelevant.

Plaintiff cannot improperly reduce the punitive-compensatory ratio (from 9:1 to 6:1) by adding its inflated attorneys' fees to the compensatory award. Opp.20. Plaintiff cites no Section 1983 case in which attorneys' fees were added to compensatories for the *State Farm* ratio, and NaphCare is aware of none. The cases Plaintiff cites involve state-law regimes allowing attorneys' fees to be considered "compensatory" for certain purposes, like in bad-faith suits eventually settled by insurers.



Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*E.g.*, *Willow Inn, Inc. v. Pub. Serv. Mut. Ins.*, 399 F.3d 224, 235 (3d Cir. 2005) (acknowledging "tension" between bad-faith statute allowing suits for unreasonable delay *without economic harm* and *State Farm*'s teaching that the ratio analysis ensures that punitives reasonably relate to *actual harm*). Moreover, NaphCare vigorously disputes that Plaintiff is entitled to more than $1.3 million in attorneys' fees; NaphCare maintains that no more than $265,000 would be warranted even if Plaintiff could prevail under *Monell* (it cannot). *See* ECF.280 at 1, 12.

### D. None of Plaintiff's remaining arguments justify this award.

Plaintiff's arguments (at 14–17) regarding reprehensibility are unsupported. As this Court correctly observed, "no evidence was presented at trial indicating, and the jury in this matter did not find, that Ms. Hill's death was the result of intentional malice, trickery, or deceit or that it was precipitated by instances of other individuals receiving inadequate medical care on medical watch." ECF.293 at 7; *see also* ECF.286 at 3–7, 11–22, 27. Further, Plaintiff does not dispute that the punitive award is excessive given NaphCare's financial condition, evidence of which was presented at trial. *See* Tr.515–18.

## CONCLUSION

The Court should grant judgment for NaphCare on *Monell* liability, or in the alternative grant a new trial. In the event the Court sustains *Monell* liability, the punitive award should be reduced to the 1:1 ceiling, excluding attorneys' fees, which cannot count to the "compensatory" component in a Section 1983 case.



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Dated: September 26, 2022

By: s/ Eric B. Wolff

Eric B. Wolff, Bar No. 43047
David A. Perez, Bar No. 43959
Michelle L. Maley, Bar No. 51318
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000
EWolff@perkinscoie.com
DPerez@perkinscoie.com
MMaley@perkinscoie.com

*Attorneys for Defendant*
*NAPHCARE, INC.*

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on September 26, 2022, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of the filing to the email addresses indicated on the Court's Electronic Mail Notice List.

DATED this 26th day of September, 2022.

s/ Carla Bone
Carla Bone, Legal Practice Assistant



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# EXHIBIT A

**Cases Plaintiff cites to support the $24 million punitive sanction**+

| **Cases involving nominal or small ($50,000 or less) compensatory awards or pre-trial proceedings** | **Cases not involving Section 1983** | **Cases involving intentional malice, intentional discrimination, trickery, deceit, bad faith, and/or repeated wrongdoing** |
|---|---|---|
| *Arizona v. ASARCO LLC*, 733 F.3d 882 (9th Cir. 2013) (nominal), *overruled en banc*, 773 F.3d 1050 (9th Cir. 2014)<br>*Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008) (nominal), *overruled by Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014)<br>*Kunz v. DeFelice*, 538 F.3d 667 (7th Cir. 2008) ($10,000)<br>*Bains LLC v. Arco Prod. Co.*, 405 F.3d 764 (9th Cir. 2005) ($50,000)*<br>*Hunter v. Durell*, 2018 WL 6249789 (W.D. Wash. Nov. 29, 2018) ($40,000)<br>*Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852 (E.D. Wis. 2015) ($6,000)<br>*Valarie v. Mich. Dept. of Corr.*, 2008 WL 4939951 (W.D. Mich. Nov. 17, 2008) (pretrial proceeding with no damages yet awarded)<br>*Henderson v. Young*, 2008 WL 11454792 (N.D. Cal. July 17, 2008) (nominal) | *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443 (1993) (superseded by *State Farm*)*<br>*Flores v. City of Westminster*, 873 F.3d 739 (9th Cir. 2017)<br>*King v. GEICO Indem. Co.*, 712 F. App'x 649 (9th Cir. 2017)<br>*Craig Outdoor Advert. v. Viacom Outdoor*, 528 F.3d 1001 (8th Cir. 2008)*<br>*Bains LLC v. Arco Prod. Co.*, 405 F.3d 764 (9th Cir. 2005)*<br>*Planned Parenthood of Columbia/ Williamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949 (9th Cir. 2005)*<br>*Willow Inn, Inc. v. Pub. Serv. Mut. Ins.*, 399 F.3d 224 (3d Cir. 2005)*<br>*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003)*<br>*Diaz v. Tesla, Inc.*, 2022 WL 1105075 (N.D. Cal. Apr. 13, 2022)<br>*Allen v. Takeda Pharm. N. Am., Inc.*, 2014 WL 5461859 (W.D. La. Oct. 27, 2014)<br>*Miller v. Equifax Info. Servs., LLC*, 2014 WL 2123560 (D. Or. May 20, 2014)<br>*San Fernando Lenders v. Compass USA*, 2013 WL 3944184 (D. Nev. July 30, 2013)<br>*Ondrisek v. Hoffman*, 2011 WL 13232559 (W.D. Ark. Sept. 13, 2011), *rev'd in part*, 698 F.3d 1020 (8th Cir. 2012)<br>*Aleo v. SLB Toys USA, Inc.*, 995 N.E.2d 740 (Mass. 2013)<br>*Grassie v. Roswell Hosp. Corp.*, 258 P.3d 1075 (N.M. Ct. App. 2010)<br>*Blount v. Stroud*, 395 Ill. App. 3d 8 (2009)<br>*Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. 2008)<br>*Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640 (2005)*<br>*Union Pac. R.R. Co. v. Barber*, 149 S.W.3d 325 (Ark. 2004)* | All of the non-1983 cases from the column to the left also involve intentional malice, intentional discrimination, trickery, deceit, bad faith, and/or repeated wrongdoing, except the New Mexico case (*Grassie*), which involved deliberate indifference by individual treatment providers and would not have triggered liability against the hospital under the Supreme Court's *Monell* precedents<br><br>*Morris v. Bland*, 666 F. App'x 233 (4th Cir. 2016) (five officers showed repeated and callous deliberate indifference over three days)<br>*Kunz v. DeFelice*, 538 F.3d 667 (7th Cir. 2008) (also involves insubstantial compensatories)<br>*Hunter v. Durell*, 2018 WL 6249789 (W.D. Wash. Nov. 29, 2018) (also involves insubstantial compensatories)<br>*Murphy v. Gilman*, 551 F. Supp. 2d 677 (W.D. Mich. 2008) (malice as shown by reckless disregard over five days)* |

+ Plaintiff cites no *Monell* cases.

*The cases flagged with an asterisk precede *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

# EXHIBIT D

Tana W. Whelan
David Force
Assistant Attorney General
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

**THE HONORABLE STANLEY A. BASTIAN**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| ATANU MUKHERJEE,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>Defendant. | NO. 2:19-cv-00402-SMJ<br><br>DEFENDANT'S MOTIONS IN LIMINE<br><br>July 18, 2024<br>11:00 AM<br>[Pretrial Conference] |

The Defendant Washington State University (WSU) respectfully moves the Court for an order excluding the following inadmissible evidence with arguments in support of these motions. These motions replace Defendant's previously filed motions. ECF No. 69, ECF No. 93

1. **WSU moves to exclude testimony and argument regarding the financial resources of WSU.**

Dr. Mukherjee may argue or ask the jury to infer that the resources available to the Defendant should somehow be considered; for example, Plaintiff

may make reference to the amount of resources available to WSU in defending this action and contrast this with the resources available to the Plaintiff. However, admissible evidence must be relevant, meaning it must be both probative and material. Fed. R. Evid. 401. To be probative, the evidence must have a "tendency to make existence of any fact … more probable or less probable." *Id.* Here, the amount of WSU's resources does not make the existence of any fact involved in Plaintiff's claims either more or less likely. Thus, reference to WSU's resources available to defend this suit is irrelevant to the allegations and should be excluded.

In addition to lacking probative value, evidence of economic means is unfairly prejudicial to the Defendant under Fed. R. Evid. 403. "Unfair prejudice" is the prejudice that results from evidence which is more likely to produce an emotional response from the jury rather than a rational decision. *White v. Ford Motor Co.*, 500 F.3d 963, 977 (9th Cir. 2007). It is normal for people to root for the "little guy" going against a large business or government entity but such emotional approach is antithetical to the logical approach the law requires. Accordingly, the Court should exclude evidence regarding WSU's financial and legal resources.

**2. WSU moves to exclude testimony, comment, and argument which invites jurors to conceptually put themselves in the place of the Plaintiff.**



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Asking the jury to put themselves in the place of one of the parties is universally disfavored by federal Courts because it encourages the jury to depart from neutrality and decide the case on the basis of personal interest, emotion and bias as opposed to the evidence. *Lovett v. Union Pac. R.R. Co.*, 201 F. 3d 1074, 1083 (8th Cir. 2000). Dr. Mukherjee should be precluded from offering any testimony, comment, or argument that invites jurors to put themselves in the place of the Plaintiff as this type of argument, comment, or testimony is improper and irrelevant and can only serve to cause unfair prejudice. *See* Fed. R. Evid. 403.

**3. WSU moves to preclude the Plaintiff from testifying that he was subjected to discrimination and prejudice.**

The Court should preclude Plaintiff from offering legal conclusions—i.e., the Defendant discriminated against him in the selection process in 2017 and 2018. *United States v. Crawford*, 239 F.3d 1086, 1091 (9th Cir. 2001) (trial court erred by admitting lay witness testimony that a university could not "abandon" property because "abandon" has a special legal meaning); *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (expert testimony concerning legal conclusions does little more than tell the jury what conclusion to reach and is thus of little use). Dr. Mukherjee has no direct evidence that he was discriminated against and admitted as much in his deposition. ECF 35-1 at 9. It appears that Plaintiff's only claim for discrimination is based on his view that he was the best applicant for the position such that hiring anyone besides himself can only have been based on discrimination. Because he admits that he does not have personal knowledge



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

of discrimination any such claim or testimony is inadmissible and should be excluded under Fed. R. Evid. 401, 403 and 702.

**4. WSU moves to exclude testimony, evidence, argument or comment from lay witnesses as to the motives of others where such witnesses were not involved in the acts or decisions.**

Fed. R. Evid. 602 provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

*See also* Fed. R. Evid. 701, 702 and 703 and comment following Fed. R. Evid. 701. Dr. Mukherjee's and other non-decision-making individuals' perceptions or opinions about Dr. Mukherjee's relative qualifications are irrelevant. *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986) (citing *Smith v. Flax*, 618 F.2d 1062, 1063 (4th Cir. 1988)). While specific factual evidence of Dr. Mukherjee's alleged qualifications may be admissible; opinions and speculation on why certain decisions were made, another person's intent, or whether the Plaintiff was subject to discrimination offered by anyone not involved in the decision-making process should be excluded under Fed. R. Evid. 401, 403, and 602.

**5. WSU moves to prohibit Plaintiff from offering expert testimony because no experts or reports have been disclosed in discovery.**



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Court orders in this case require the disclosure of expert witnesses in advance of trial. *See* ECF No. 14. Dr. Mukherjee did not identify any experts by the deadline (December 29, 2020). At no time in discovery has Dr. Mukherjee identified or disclosed any expert witnesses or provided expert reports. Therefore, Plaintiff Mukherjee should not be permitted present expert testimony. Dr. Mukherjee should be precluded from personally offering opinion testimony that the rules of evidence reserve for a qualified expert witness.

Dr. Mukherjee or his witnesses, should not be allowed to testify about any subject not timely disclosed in his interrogatory responses, depositions, or responses to requests for production. Fed. R. Civ. P. 37(b)(2)(B); *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367 (9th Cir. 1992). Any such surprise testimony at trial would substantially prejudice Defendant's ability to prepare for cross examination and obtain contradicting witnesses. Under Fed. R. Civ. P. 37, courts have discretion to issue sanctions for discovery violations, including dismissal of the case. *Wanderer v. Johnston*, 910 F.2d 652, 655-65 (9th Cir. 1990) (*citing Nat. Hockey League v. Metro Hockey Club, Inc.*, 427 U.S. 639, 640-41 (1976)). The Court may also exclude the evidence from trial. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-06 (9th Cir. 2001) (excluding testimony from an expert witness).

**6. WSU moves to exclude Dr. Mukherjee from testifying as an expert economist.**

Lay witnesses may offer testimony in the form of an opinion only if that


ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

testimony is: (1) rationally based on the witness' perception; (2) helpful to clearly understanding the witness' testimony or determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702. A witness qualified as an expert by their knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

The calculation of economic damages over time requires an understanding and valuation of inflation and interest rates over time. This is technical and specialized knowledge such that it should be excluded under Fed. R. Evid. 702. The trial judge is the gatekeeper and the *Daubert* test applies to specialized knowledge just as it does to scientific matters. *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137 at 141 (1999). While Dr. Mukherjee holds a Ph.D. in Soil and Water Science that does not in and of itself qualify him to offer opinion testimony regarding his alleged economic losses. Calculation of Dr. Mukherjee's economic losses and adjusting them to present value require specialized calculations based upon knowledge and training which he does not have.

**7. WSU moves to exclude opinion testimony about alleged biases and prejudices in academia generally.**



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

It is anticipated that Dr. Mukherjee may attempt to offer opinion testimony regarding his beliefs surrounding the role biases play in hiring in academia. Even if such a view is truly held by the Plaintiff, such opinion is not helpful to the trier of fact and is thus not relevant under Fed. R. Evid. 401 and 402. Further such testimony is not the type of lay opinion that would be admissible under Fed. R. Evid. 701. To the extent that Dr. Mukherjee claims to have personally suffered discrimination by institutions other than WSU this is not relevant and is clearly prejudicial to WSU, and should be excluded under Fed. R. Evid. 402.

Dr. Mukherjee does not have the requisite qualifications, experience, knowledge, or training to offer testimony regarding biases in hiring in academia. It is anticipated that Dr. Mukherjee may attempt to offer testimony regarding his beliefs surrounding the role biases play in hiring in academia. He is unqualified to offer specialized testimony left for a qualified expert; accordingly, he should be precluded from offering such testimony. Generalized testimony about biases or discrimination is also not relevant to his claims of intentional discrimination and will only serve to mislead and confuse the jury.

**8. WSU moves to exclude evidence related to "front pay" or "back pay" damages.**

Specifically the defense moves to excluding Dr. Mukherjee from testifying about back pay. Back pay under Title VII is considered to be an equitable remedy and is determined by the Court. *Lutz v. Glendale Union High School*, 403 F.3d

1061, 1069 (9th Cir. 2005). As such Dr. Mukherjee should not be allowed to testify about any estimations he has made of back pay.

Front pay is considered to be an equitable remedy that is generally understood to be an award for lost compensation for the period between judgment and reinstatement. *Antoine v. Brooklyn Maids 26, Inc.* Because this is an equitable remedy provided by 42 U.S.C. § 2000e-5(g), it appears it should be treated like back pay which is calculated by the Court under the *Lutz* case. *Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 848 (2001). The Defense anticipates that in the event of a verdict for the Plaintiff, additional testimony will need to be taken by the Court, as to the viability of being placed as an associate professor and related testimony about Dr. Mukherjee's current employment.

**9. The Court should preclude evidence claiming generalized or unrelated complaints of discrimination.**

Dr. Mukherjee's claims of discrimination require evidence of discriminatory intent or purpose. Manual of Model Civil Jury Instructions No. 10.3. General testimony about alleged generalized discrimination in academic hiring fails to make the existence of an intentional discriminatory act, intent, or motive against the Plaintiff in the hiring processes in 2017 and 2018 more or less likely, and should be excluded.

Evidence or testimony about unrelated acts, a general environment of discrimination in hiring in academia, and unrelated allegations of discrimination


ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

are not relevant and will likely confuse or mislead the jury. Such irrelevant and confusing evidence would also have the effect of appealing to a juror's passion or prejudice rather than having a focus on the law and the elements of his claims that Dr. Mukherjee must prove. Fed. R. Evid. 403.

Dr. Mukherjee should be precluded from introducing any evidence or testimony of general discrimination against individuals in his same protected classes. Unrelated or generalized claims of discrimination against individuals in those protected classes is irrelevant to whether he can prove his specific claim of discrimination and will only serve to mislead and confuse the jury.

**10. WSU moves the Court to preclude the Plaintiff from seeking damages from the 2017 employment search.**

Dr. Mukherjee should be precluded from seeking damages related to WSU's 2017 candidate search as opposed to the 2018 search. As discussed in the Court's Order Denying Defendant's Motion for Summary Judgment (ECF 46), the Defendant was aware that he had neither been interviewed nor hired from the 2017 search process at the time the position was reposted in January 25, 2018. Dr. Mukherjee did not bring any EEOC charge until February 12, 2019 (the date he signed the EEOC charge document). Because this is more than 300 days after Dr. Mukherjee was screened from consideration and more than 300 days after he was aware that he was not hired, he is barred from bringing action against the 2017 committee process by his failure to file his notice of charge within 300 days.



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

42 U.S.C. §2000e-5(e)(1).[1]

**11. The Court should exclude any arguments, testimony or comments directed to showing that plaintiffs are entitled to punitive damages.**

Plaintiffs allege in their complaint that they are entitled to punitive damages. However, punitive damages are not recoverable in this case. Therefore, any evidence offered for purposes of establishing punitive damages should be excluded.

Punitive damages are not recoverable against the state, its agencies, or state officials sued in their official capacities. *Newport v. Fact Concerts*, 453 U.S. 247, 69 L. Ed.2d 616, 1010 S.Ct. 2748 (1981); 42 U.S.C. § 1981a(b)(1). Similarly, punitive damages are not allowed under Washington law, including under Wash. Rev. Code 49.60 or common law claims, and are regarded as "contrary to public policy." *E.g., Dailey v. N. Coast Life*, 129 Wn.2d 572, 574, 919 P.2d 58 (1996); *Barr v. Interbay Citizens Bank*, 96 Wn.2d 692, 699-700, 649 P.2d 566 (1981). Therefore, any arguments or evidence intended to support claims for punitive damages should be excluded.

**12. The Court should exclude evidence not timely and duly disclosed in the course of discovery.**

---

[1] WSU does not concede that the 300 day period applies and it may be that the 180 day period is applicable such that both the 2017 hiring and the 2018 are precluded from suit. Even if the 300 day limitation applies, any claim related to 2017 is outside of that time period and should be barred.



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

The Plaintiff and his witnesses should not be allowed to testify about any subject or elicit evidence not timely disclosed in her interrogatory responses, depositions, or responses to requests for production. Fed. R. Civ. P. 37(c). Any such surprise testimony at trial would substantially prejudice Defendant's ability to prepare for cross-examination and obtain contradicting witnesses. Parties have an affirmative duty to answer discovery in a timely fashion and to supplement discovery when different or additional information becomes known. Fed. R. Civ. P. 26(e); *Imax Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1165-66 n.6 (9th Cir. 1998); *United States v. Lummi Indian Tribe*, 841 F.2d 317, 320 (9th Cir. 1988) (concerning Fed. R. Civ. P. 16). This rule is intended to prevent a party from hiding facts in discovery then using them with a greater or lesser degree of surprise at trial without allowing the other party the right of adequate discovery and preparation.

**13. The Court should prohibit plaintiff from making requests or demands in the presence of the jury for documents or information which may be kept or maintained by defendant.**

Under Fed. R. Civ. P. 34, a party responding to a discovery request is given 30 days in which to comply with the request. Fed. R. Civ. P. 34(b). Similarly, requests during trial for documents under the Public Records Act[2] are untimely. *See* Wash. Adm. Code 381-20-050. The Court should exercise its discretion and preclude such requests during trial.

---

[2] Wash. Rev. Cod. § 42.56 (2010).



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

**14. The Court should exclude any argument or testimony concerning either parties' offers to settle this case.**

Argument or evidence concerning settlement negotiations should be excluded under Fed. R. Evid. 408 as inadmissible offers to compromise, or statements made during settlement negotiations. Moreover, testimony that the parties attempted to settle, or that the other party allegedly was "unreasonable" with respect to settlement negotiations, should similarly be prohibited as it threatens to compromise statements made during settlement negotiations.

**15. The Court should exclude evidence or argument that alleged violations of policy manuals occurred.**

Any reliance on state policies, procedures, or manuals as a source for determining whether a law has been violated is flawed as a matter of law. *See, e.g., Melville v. State*, 115 Wn.2d 34, 39-40, 793 P.2d 952 (1992) (making a "distinction between regulations [and statutes] having the force of law and policy manuals or recommended procedures which lack the force of law."); *State v. Dane*, 89 Wn. App. 226, 234, 948 P. 2d 1326 (1997), *review denied*, 135 Wn.2d 1014 (1998) (in accord). Policy manuals, or expert testimony about what policy manuals purportedly require, are inadmissible because manuals do not carry the force of law, may confuse or mislead the jury about the applicable law, and improperly intrude on the Court's function to instruct the jury on applicable law. *Valley Land Office, Inc. v. O'Grady*, 72 Wn.2d 247, 253-54, 432 P.2d 850 (1967);



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

Fed. R. Evid. 403. Evidence that Defendant's employees allegedly violated their agency's internal policies or procedures is not probative of the real issue in this case and should be excluded.

Any relevance attributed to aspirational policy or procedure manuals would be outweighed under ER 403. Such evidence would mislead and confuse the jury as to what the applicable law is by which Defendant's conduct should be judged. *See Braam v. State*, 150 Wn.2d 689, 708, 81 P.3d 851 (2003) (finding abuse of discretion and reversible error in admitting aspirational policy manual against DSHS as evidence of the standard of care). Moreover, it would be unfairly prejudicial to suggest that less than perfect compliance with aspirational policy manuals is evidence of negligence. There is no dispute that agency policy guidelines are routinely revised, subject to exceptions, and may be overridden upon a supervisor's approval. Perfection, or perfect compliance with a policy subject to exceptions and revisions, is not the applicable legal standard of care by which Defendant's conduct should be judged. These policies are not unequivocally binding on the State. Therefore, any reference to policy manuals should be excluded pursuant to Fed. R. Evid. 401, 402 and 403.

**16. Plaintiff's Subjective Opinions And Testimony About What the Hiring Committee Did To Other Applicants Is Not Relevant To Prove His Claims And Is Unduly Prejudicial If Admitted.**

Plaintiff may attempt to bolster his own "evidence" by claiming that discrimination happened to other applicants and claiming that such events also happened to him ("me too" evidence).



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

This case is not about what might be alleged to have occurred with respect to others, but what happened to Plaintiff and whether the conduct, if proven, was due to discrimination. Moreover, any such statements by Plaintiff are hearsay. Plaintiff and his attorneys should be precluded from asserting this type of conjecture, speculation, and arguments to inflame the jury. FRE 602.

**17. Plaintiff's Subjective Opinions and Testimony about what may have occurred with Applications he made to other Potential Employers is not relevant to prove his claims and is unduly prejudicial if admitted.**

Plaintiff may attempt to bolster his own "evidence" by claiming that discrimination happened to Plaintiff at other potential employers and that discrimination is rampant in the hiring of educators within higher education.

This case is not about what might be alleged to have occurred with respect to Plaintiff's applications at other universities/other potential employers, but what happened to Plaintiff and whether the conduct, if proven, was due to discrimination. Moreover, any such statements by Plaintiff are hearsay. Plaintiff and his attorneys should be precluded from asserting this type of conjecture, speculation and arguments to inflame the jury. FRE 602.

## CONCLUSION

For the foregoing reasons, Defendant requests its Motions in Limine be granted.

//

//



ATTORNEY GENERAL OF WASHINGTON
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

DATED this 24th day of June, 2024, at Spokane, Washington.

ROBERT W. FERGUSON
Attorney General

*s/Tana Whelan*
TANA WHELAN, WSBA No. 54306
DAVID FORCE, WSBA No. 29997
Assistant Attorneys General
1116 W. Riverside, Suite 100
Spokane WA 99201
509-456-3123 - Telephone
509-458-3548 – Fax
Tana.Whelan@atg.wa.gov
David.Force@atg.wa.gov

**PROOF OF SERVICE**

I certify that I electronically filed this document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David Koller
2043 Locust St Ste 1B
Philadelphia, PA 19103

Richard D. Wall
1604 W. Dean
Spokane, WA 99201

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of June, 2024, at Spokane, Washington.

ROBERT W. FERGUSON
Attorney General

*s/Tana Whelan*
TANA WHELAN, WSBA No. 54306
DAVID FORCE, WSBA No. 29997
Assistant Attorneys General
1116 W. Riverside, Suite 100
Spokane WA 99201
509-456-3123 - Telephone
509-458-3548 – Fax
Tana.Whelan@atg.wa.gov
David.Force@atg.wa.gov